## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

NICOLE B.,                                    :
                                              :
              Petitioner,                     :         Civ. No. 20-7467 (KM)
                                              :
       v.                                     :
                                              :
THOMAS DECKER, *et al*.,                      :              **OPINION**
                                              :
              Respondents.                    :
                                              :

---

**KEVIN MCNULTY, U.S.D.J.**

## I.      INTRODUCTION

Petitioner, Nicole B.,[1] is an immigration detainee. When she filed this action, she was detained at the Hudson County Correctional Center ("HCCC") in Kearny, New Jersey. ICE ordered her transfer to the Bergen County Jail in Hackensack, New Jersey, because HCCC will no longer be housing female detainees. All parties are proceeding on the assumption that the transfer to Bergen has occurred, or will occur very shortly.

Petitioner is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) She has separately filed a Motion for a Temporary Restraining Order ("TRO") seeking her immediate release from custody. (DE 2.) Respondents filed a response to the petition and motion (DE 10), and Petitioner filed a reply (DE 14). The parties provided status updates concerning the impending transfer to Bergen County. (DE 17, DE 18.) Petitioner requested and received the opportunity to have oral argument on her petition *via*

---

[1]      Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

video conference. (DE 23.) At the close of oral argument, I authorized both sides to submit additional papers, and they did so. (DE 19; DE 20; DE 21; DE 22.)

Because there has been an opportunity for full briefing and presentation of facts, I will bypass the TRO stage and proceed directly to the preliminary injunction. For the reasons set forth below, a preliminary injunction will be denied.

## II.     BACKGROUND

### A.     COVID-19 Pandemic

The United States is currently experiencing a global pandemic caused by a novel coronavirus commonly referred to as COVID-19. *See* Ctrs. for Disease Control and Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 20, 2020). In the United States to date, more than 3.6 million people have been infected by COVID-19 and over 136,000 people have died. *See id.* Initially, New Jersey was one of the states most impacted by the respiratory illness, seeing a sharp rise in cases throughout the months of March and April of 2020. *See* N.Y. Times, *New Jersey Coronavirus Map and Case Count*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html (last visited July 20, 2020). Since then, fortunately, the overall trend of new cases in New Jersey has sharply fallen. *See id.* However, there is not yet a cure or vaccine for this infectious disease and it continues to present a public health threat. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 20, 2020).

The COVID-19 virus spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. *Id.* In order to thwart the spread of the illness, the Centers for Disease Control and Prevention ("CDC")

recommend social distancing (staying at least six feet away from others), wearing cloth face coverings when around others, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *Id.* Obviously, however, the "the best way to prevent illness is to avoid being exposed to this virus." *Id.*

Although COVID-19 can affect anyone, the CDC has identified groups of individuals who "are more likely than others to become severely ill, which means they may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die." *See* Ctrs. for Disease Control and Prevention, *People Who Are at Increased Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited July 20, 2020). As the CDC continues to gather more information about COVID-19, this list of individuals at "increased risk for severe illness" has been and likely will continue to be updated. *Id.*

## B.    Background

### i.    Procedural History

Petitioner is a 43-year-old native and citizen of Jamaica. (DE 1 at 2, 22.) Petitioner's lamentable immigration history was described in a prior opinion by Judge Vazquez:

> In 1999, following a period of immigration detention, Petitioner voluntarily departed the United States for Jamaica. At some point between her voluntary departure in 1999 and 2009, Petitioner returned to the United States. On October 29, 2009, an immigration judge ("IJ") ordered Petitioner's removal from the United States. Sometime thereafter, Petitioner re-entered the United States and was again removed on September 26, 2016.
>
> Following the 2016 removal, it appears that Petitioner again entered the United States. On August 10, 2017, Petitioner was arrested by Immigration and Customs Enforcement ("ICE") for illegal re-entry in violation of 8 U.S.C. § 1326(a), (b)(1). Petitioner was convicted of that charge in the United States District Court for the Eastern District of New York on February 6, 2018. That same day, Petitioner

was sentenced to an eight-month term of imprisonment and was granted credit for time-served since her arrest on August 10, 2017. Petitioner re-entered ICE custody on April 6, 2018.

On April 17, 2018, Petitioner was served with a Notice of Referral to an Immigration Judge, notifying her that her prior removal order was reinstated. Petitioner then requested a review of her reasonable fear claim. On May 22, 2018, Petitioner and her counsel appeared for a reasonable fear hearing before an IJ. At that hearing, the IJ made a finding of reasonable fear and vacated the prior decision of the Department of Homeland Security ("DHS"). Petitioner was thereafter placed into withholding-only proceedings. On August 15, 2018, Petitioner and counsel appeared for a master calendar hearing before an IJ, at which time the hearing was adjourned to an individual calendar hearing on the merits to allow Petitioner time to file an application for withholding of removal. On November 5, 2018, Petitioner and counsel appeared for a hearing on the merits of Petitioner's request for withholding of removal. Petitioner's request was denied. Petitioner appealed that denial to the Board of Immigration Appeals ("BIA") on November 23, 2018.

On November 27, 2018, Petitioner requested an individualized bond hearing in light of the Third Circuit's decision in *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208 (3d Cir. 2018). Petitioner was originally scheduled to appear for a bond hearing on December 20, 2018, but the hearing was adjourned to January 2, 2019. Petitioner appeared with counsel for a bond hearing on January 2, 2019, which was later adjourned to allow Petitioner time to prepare. On January 10, 2019, Petitioner appeared with counsel for a bond hearing, at which time Petitioner's request for bond was denied because the IJ found that Petitioner was a flight risk and posed a danger to the community. Petitioner reserved her right to appeal that decision.

On February 4, 2019, the BIA dismissed Petitioner's appeal of the IJ's decision on withholding because Petitioner had waived her right to appeal the decision. Petitioner appealed that decision to the Second Circuit on March 5, 2019. On March 15, 2019, Petitioner filed a motion for stay of removal. That motion has not yet been ruled on. Pursuant to a forbearance agreement between ICE and the Second Circuit, Petitioner's removal will be delayed until the adjudication of her motion for stay of removal.

*See Nicole S. A. B. v. Edwards*, Civ. No. 19-14608, 2019 WL 6606864, at *1 (D.N.J. Dec. 5, 2019)

(internal citations omitted).

In July 2019, Petitioner filed a previous § 2241 petition which challenged the duration and propriety of her detention. *Id.* Judge Vazquez denied the petition, finding that her detention was lawful under 8 U.S.C. § 1231(a); that the Court lacked jurisdiction to review the outcome of her *Guerrero-Sanchez* hearing; and that she had failed to demonstrate that she was entitled to release under *Zadvydas v. Davis*, 533 U.S. 678 (2001). *Id.* at 3–4.

Last week, on July 9, 2020, Petitioner's appeal to the Second Circuit was denied and the accompanying stay of removal was therefore lifted. *See generally Nicole S. A. B. v. Barr*, No. 19-553 (2d Cir. July 9, 2020). Her immigration attorney states that he will soon file a motion with the BIA to reopen her immigration proceedings based on alleged ineffective assistance of counsel. (DE 20-2; DE 21.)

## C.   Conditions at Bergen County Jail

### i.   *Respondents' Evidence Regarding the Conditions at Bergen County Jail*

Respondents have provided the declaration of Captain Michael Russo, who is responsible for the overall daily operations at Bergen County Jail, to describe the measures the facility has implemented to combat the spread of COVID-19. (DE 19-1.) As a result of the COVID-19 crisis, Captain Russo states, that facility has enacted numerous new protocols. (*Id.* at 2.) Those protocols are lengthy and detailed, and I summarize them only briefly.[2]

Bergen County Jail, designed to house a maximum of 1200 persons, currently houses only 271 county inmates and 117 ICE detainees. (*Id.* at 1.) ICE detainees and county inmates are not mixed together; the two groups occupy separate housing units. (*Id.*) Each cell within the housing unit is approximately 10 feet by 7 feet and contains two beds in a "bunk-bed style." (*Id.*) Due to

---

[2]   I believe that Capt. Russo is describing conditions as to detainees generally, not the female detainees, who currently number only five.

the current low number of female ICE detainees – just five as of July 8, 2020 – female detainees are currently housed in a "dormitory" and not in cells. (*Id.* at 4.)

Although the facility had previously suspended the intake of new ICE detainees, it began on June 10, 2020 to accept new detainees subject to certain safeguards. (*Id.*) Some of these requirements include face masks when arriving at the facility; testing for COVID-19 upon arrival; and housing incoming detainees in a "Medical Separation Unit" until test results are returned. (*Id.*)

Detainees remain in their cells, except for "staggered two-hour periods of time throughout the day when they are permitted to exit the cell area (detainees and inmates are out of their cell for a total of 6-8 hours each day)." (*Id.* at 3.) A maximum of thirty-two detainees are permitted to leave their cells at any one time. (*Id.*) During that time, the detainees have approximately 2,643 square feet of space available for recreational use, which provides them "ample room" to socially distance. (*Id.*)

Before entering the facility, all staff and vendors must receive temperature screenings. (*Id.* at 3.) Those who present with a fever above 100 degrees Fahrenheit are not permitted inside. (*Id.*) Staff members have been provided face masks to wear, and gloves are available as necessary. (*Id.*) The facility has also increased its general cleaning. (*Id.* at 5.) Each housing unit is sanitized "no less than four times per day" and communal bathrooms are sanitized "every shift." (*Id.*) The jail also provides disinfectant spray, hand sanitizer, and soap for each housing unit. (*Id.*) Additional cleaning supplies are available for detainees to sanitize the bathrooms, showers, and telephones prior to use. (*Id.*) The facility has not experienced any shortage of cleaning supplies or personal protective equipment. (*Id.*)

Bergen County Jail is providing education to staff and detainees on best practices to prevent the spread of COVID-19, including hand washing and hand hygiene. (*Id.*) There are also signs in

English and Spanish posted throughout the facility reminding detainees and staff of the hygienic protocol and to maintain proper social distancing. (*Id.*) Detainees have been advised to seek medical care if they feel ill and they have "daily access to sick call." (*Id.*) Detainees have also been issued both surgical masks and cloth masks and instructed to wear their masks any time they are out of their cell. (*Id.*) The surgical masks are replaced at least once a week, as well as upon request. (*Id.*)

The facility is following guidance issued by the CDC for correctional facilities in its evaluation and testing of detainees. (*Id.* at 4.) Medical staff "immediately evaluate" any detainee who complains of illness. (*Id.*) Those who present symptoms are tested for COVID-19. (*Id.*) If a detainee tests positive, but does not require hospitalization, the detainee is isolated in a cell in separate housing unit. (*Id.*) Individuals who are symptomatic and awaiting test results are also housed in that same unit. (*Id.*) However, the "suspected positives" are kept on one side of the unit, separate from the confirmed positive individuals. (*Id.*) The facility also uses a practice known as "cohorting," where detainees who have had exposure to someone with confirmed COVID-19 are housed together. (*Id.* at 5.) If no new cases of COVID-19 develop after 14 days, the cohorting is discontinued. (*Id.*)

As of July 8, 2020, two ICE detainees had tested positive for COVID-19. (*Id.* at 6.) One of those individuals was released from the facility in March 2020 and the other was released from quarantine on April 13, 2020. (*Id.*) There are currently no detainees who are suspected of having COVID-19. (*Id.*) One county inmate has tested positive for COVID-19 and another inmate is suspected of having the virus. (*Id.*) The individual with suspected infection is on medical observation per CDC guidelines. (*Id.*) Finally, 27 correctional officers and five nurses have tested

positive. (*Id.*) Two officers remain in isolation, but the other 25 officers and five nurses have been cleared and returned to duty. (*Id.*)

    *ii.*    *Petitioner's Evidence Regarding the Conditions at Bergen County Jail*

Regarding the conditions at Bergen County Jail, Petitioner submits Dr. Greifinger's declaration. (DE 20-1.) Dr. Greifinger reviewed Captain Russo's declaration and opines on the protocols that the facility has implemented. (*Id.*) I highlight here only some of Dr. Greifinger's statements which underscore his overall conclusion that the measures taken by the facility are inadequate to stop the spread of the virus. (*Id.* at 3.)

Dr. Greifinger states that all inmates should be tested; testing only incoming detainees and symptomatic individuals fails to account for those who are asymptomatic or pre-symptomatic, "even though research shows that these groups present a serious risk of spreading the virus." (*Id.* at 2.) Absent continuing, universal testing, Dr. Greifinger maintains that there is no way to ensure that asymptomatic yet contagious individuals will not infect the general population. (*Id.*) Dr. Greifinger also expresses concern over the facility's reliance on individuals to self-report their symptoms. (*Id.*) Individuals may not realize their symptoms are consistent with COVID-19, or they may choose not to report their symptoms for various reasons. (*Id.*) He also suggests that "[b]ecause of these failures [in testing], Bergen County Jail appears to by systematically undercounting the number of infections among detainees in its custody." (*Id.*)

Dr. Greifinger states that the "screening" of staff and vendors entering the facility is also insufficient. (*Id.*) He contends that a temperature check is inadequate to prevent staff and vendors from introducing the virus into the facility since asymptomatic individuals can still carry and transmit the virus. (*Id.*)

Because of shortcomings in the testing regime, Dr. Greifinger states, the lack of any newly diagnosed COVID-19 cases among detainees recently does not establish that the outbreak is over. (*Id.* at 4.) The figures provided by Captain Russo, he states, are likely not representative of the true number of cases at the facility. (*Id.*) The fact that staff members have continued to test positive presents a likelihood that the virus will be transmitted to detainees since "staff-detainee physical interactions are a necessary part of jail management." (*Id.*) Dr. Greifinger submits that "medical experts agree that there is likely to be at least one subsequent 'wave' of infection from the coronavirus." (*Id.*) He posits that since the staff and vendors continue to come and go from the facility, "just one positive case among the staff could newly ignite a rapidly spreading outbreak among the detained population." (*Id.*)

### III.    JURISDICTION

Respondents raise the threshold question of whether this Court has jurisdiction to entertain this petition. (DE 10 at 17–23.) Third Circuit case law, in their view, does not permit conditions of confinement claims to be raised through a § 2241 petition. (*Id.* at 19–20.) Respondents add that even if this Court did have jurisdiction, release would not be the proper remedy. (*Id.* at 23–24.) Petitioner contends, however, that her immediate release from custody—which is "unequivocally a habeas remedy"—is the only way to address the constitutional violations challenged in this case. (DE 14 at 5–7 (quoting *Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4 (M.D. Pa. Apr. 7, 2020), *as amended* 2020 WL 1812445 (Apr. 9, 2020).)

Historically, conditions of confinement claims have been brought pursuant to 42 U.S.C. § 1983, seeking damages or amelioration of those conditions by injunction. *See Camacho Lopez*, 2020 WL 1689874, at *4–5. However, where an individual seeks "immediate or more speedy release," he or she is, or is deemed to be, asserting a remedy available through a habeas petition.

*Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973); *see also Camacho Lopez*, 2020 WL 1689874, at *4 ("[Petitioner] seeks immediate release from custody based on what he perceives to be constitutionally deficient conditions of confinement that threaten his health and life. This is unequivocally a habeas remedy.") A habeas petition is the process by which an individual may challenge the "fact or length" of confinement. *See Preiser*, 411 U.S. at 494. To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have permitted such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 n.5, 242–44 (3d Cir. 2005); *Jiminian v. Nash*, 245 F.3d 144, 146–47 (2d Cir. 2001); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978); *Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1977). Recent case law within this circuit has been fairly consistent in holding that an immigration detainee may challenge the conditions of his confinement through a § 2241 petition. *See Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Within this emerging case law, several district courts have also granted release, in the form of temporary restraining orders or preliminary injunctions, to immigration detainees whose

conditions of confinement were found to be unduly punitive in light of their medical conditions. *See Renat T. v. Decker*, Civ. No. 20-4658, 2020 WL 3819227, at *7 (D.N.J. July 8, 2020); *Jose B.R. v. Tsoukaris*, Civ. No. 20-3347, 2020 WL 2744586, at *12 (D.N.J. May 27, 2020); *Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616 (D.N.J. Apr. 12, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); *Castillo v. Barr,* Civ. No. 20-605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, Civ. No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (frequently cited as the leading case). Given these considerations, I agree with the cases that have permitted conditions of confinement claims to proceed through a habeas petition. Accordingly, I find that this Court has jurisdiction over this habeas action.[3]

## IV.   LEGAL STANDARDS

### A.  Standards: Preliminary Injunction

The petition and motion seek Petitioner's immediate release on the grounds that her continued detention violates the Due Process Clause. (DE 1 at 28; DE 2 at 47.) Such injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994)

---

[3]      Jurisdiction is properly laid in this District Court, because Petitioner is detained within this district and alleges that her detention violates the Constitution. With exceptions not relevant here, a petitioner may seek § 2241 relief only in the district wherein he or she is held in custody. *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968); *see also United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009) (reviewing case law requiring filing in district of confinement); *Gutierrez v. Gonzales*, 125 F. App'x 406, 412 (3d Cir. 2005) (surveying territorial custody requirement in relation to ICE detainees who were removed). That jurisdictional/territorial requirement flows naturally from the nature of a habeas petition, which is directed to the petitioner's custodian and alleges that the custodian is holding the petitioner in violation of the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.") (citations omitted); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).

(internal quotation marks omitted). Because the relief sought is not merely for 14 days, I have merged the TRO and preliminary injunction analyses. The standard, however, is similar; in order to obtain a TRO or preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, the strength of a claim on the merits is in a kind of resonance with the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

### B.  Standards: Conditions-of-Confinement Claim

An immigration detainee's conditions-of-confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Consistent with due process, "a detainee may not be punished prior to an

adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To determine whether a challenged condition amounts to punishment, a court will consider whether it "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Conditions of confinement are "reasonably related" to a legitimate governmental objective if they serve a legitimate purpose and be rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A challenged condition may amount to impermissible punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," or if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

The COVID-19 pandemic is too recent to have produced much definitive guidance from the United States Supreme Court or the United States Court of Appeals for the Third Circuit regarding conditions-of-confinement claims. Some principles have emerged from the case law in this district, however. In general, whether an immigration detainee's conditions of confinement amount to punishment will depend primarily on the detainee's health and the specific conditions at the detention facility. *See Cristian R.*, 2020 WL 2029336, at *2*; Thakker*, 2020 WL 2025384, at *8; *Rafael L.O.*, 2020 WL 1808843, at *7–8. Results have varied depending on the facts of the case; "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in

light of a given petitioner's medical history, no such relief is warranted." *Cristian R.*, 2020 WL 2029336, at *2.

Judge Vazquez has contributed a useful tripartite classification of cases:

(1) detainees who do not fall into a particularly vulnerable category;

(2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and

(3) detainees who have tested positive for COVID-19.

*Romeo S.K. v. Tsoukaris*, Civ. No. 20-5512, 2020 WL 2537647, at *5 (D.N.J. May 18, 2020) (line breaks added). The petitions of detainees in the first category (no particular risk factors) have generally been denied. *Id.* For those in the third category – detainees who have the virus – the critical question becomes, in Judge Vazquez's view, not release as such, but whether the detainee is receiving prompt and adequate care. *Id.* The petitions of those in the second category (prisoners with risk factors) have been granted or denied depending on the circumstances—especially, the level of the risk to the prisoner under conditions at the institution, and whether the legitimate interests of ICE can be accommodated by available conditions of release. *Id.*

## V.    DISCUSSION

In her motion, Petitioner asserts that detaining a medically vulnerable individual, such as herself, during the COVID-19 pandemic violates Due Process. (DE 1 at 26–27.) This Due Process claim rests primarily on the theory that her conditions of confinement are unduly punitive.[4] I analyze this claim under the legal standards governing preliminary injunctions and a conditions-of-confinement claim. *See* Section IV, immediately preceding.

---

[4]    In n. 12, *infra*, I deal briefly with a second theory that Respondents have been deliberately indifferent to her serious medical needs.

Petitioner argues that she is likely to succeed on the merits of her claim that, given her medical vulnerabilities and the conditions at Bergen County Jail, her continued detention is unconstitutionally punitive. (DE 1 at 26; DE 20 at 5.) Her hypertension and obesity, she argues, place her at higher risk for complications due to COVID-19, as identified by the CDC, Dr. Greifinger, and even ICE's own internal guidance. (DE 20 at 2–3.) Petitioner maintains that her detention in a facility whose protocols fail to protect medically vulnerable individuals is tantamount to punishment and a violation of her Due Process rights. (DE 20 at 5.)[5]

## A.  Petitioner's Hypertension and Obesity

Petitioner states that she suffers from hypertension and obesity, conditions which place her at an increased risk of serious illness from COVID-19. (DE 20 at 1–2.) These have been identified by the CDC as conditions that do (BMI $\geq$ 30) or might (hypertension) place an individual at higher risk if infected. (DE 11-2 at 1–2); *see also* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited July 20, 2020) (identifying medical conditions which are associated with increased risk for severe illness from COVID-19).

As evidence of the severity of her conditions, Petitioner has provided declarations from Dr. Robert Greifinger, who reviewed Petitioner's medical records. (DE 1-2; DE 14-1; DE 20-1.) Dr. Greifinger submits that Petitioner's hypertension "places her at high risk for serious health complications or death, should she acquire COVID-19." (DE 14-1 at 5.) In making this assessment, he refers to a study published by the CDC in June 2020 which concluded that "individuals with cardiovascular disease, including hypertension, are twelve times more likely to die from COVID-

---

[5]    The result here is dictated by the likelihood of success factor, which incorporates a balancing of risks. No one disputes that actually contracting a case of COVID-19 would meet the irreparable harm requirement. The third and fourth factors, balancing of harms and the public interest, need not be reached, but in any event they are in substance incorporated in the likelihood of success discussion.

19 and six times more likely to be hospitalized than patients without these conditions." (*Id.*)[6] Dr. Greifinger states that hypertension, even if treated with medication and "well-controlled," leaves patients at high risk for serious complications. (*Id.*)

Further, Dr. Greifinger asserts that Petitioner's obesity also places her at high risk if infected by COVID-19. (DE 20-1 at 5–6.) He cites the CDC's recent guidance that obesity, defined as a BMI of 30 or above (recently reduced from 40), increases an individual's risk of severe illness if infected. (*Id.*) Ultimately, Dr. Greifinger states that Petitioner presents with two medical conditions that each place her at risk for serious complications from COVID-19. (DE 20 at 6.) He opines that the only way to successfully protect Petitioner is to immediately release her from detention. (*Id.*)

Petitioner cites cases from within this district which have granted release based on hypertension and/or obesity, after balancing other factors. In a group of seven cases, analyzed in a single opinion, Judge Arleo granted release to six out of seven Hudson County detainees. *See Thierry B. et al. v. Decker*, Civ. No. 20-4035, 2020 WL 3074006 (D.N.J. June 10, 2020). As to the seventh detainee, Thierry B., Judge Arleo relied on blood pressure readings (185/120 and 162/90, based on evidence in the record) to find medical vulnerability. She denied release, however, because there were "no adequate conditions of release that will ensure the public's safety due to the serious pending charges against him," including sexual abuse of a child.[7] I myself—early in May—ordered a detainee released on conditions from Bergen County Jail, based on hypertension

---

[6]     Of course if a single study were the last word, then CDC guidance would not be limited to a warning that hypertension "might" be a risk factor. And a study lumping cardiovascular problems, "including hypertension," may be of limited usefulness here.

[7]     *See also Ricardo H. R. v. Decker*, Civ. No. 20-5134, 2020 WL 3542306, at *9, 11 (D.N.J. June 30, 2020) (hypertension and enlarged heart); *Cristian A.R.*, 2020 WL 2092616, at *3 (hypertension, case dating from April 12, 2020).

in conjunction with a depressed white blood cell count. *Kevin M. A. v. Decker*, Civ. No. 20-4593, 2020 WL 2092791 (D.N.J. May 1, 2020).

Hypertension, as noted, has for some time been recognized by the CDC as a factor that "might" pose a danger. *See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcorona virus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited July 20, 2020) (stating that individuals with high blood pressure "might be" at heightened risk). Petitioner's medical records reveal that her blood pressure has been "elevated." Through 2019 and the first quarter of 2020, her blood pressure readings were for the most part in the range of 120-130 systolic and 80-90 diastolic. On April 27, 2020, her blood pressure reading was 120/72, but it spiked to 166/98 on May 4, 2020. Petitioner's medical records indicate that she has been receiving medication to treat her hypertension since May 2020. (DE 11-2 at 2.) Her most recent reported blood pressure reading, as of June 16, 2020, was 127/76. (DE 11-2 at 2, 11-1 at 1) *See https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417* (Stage 1 hypertension defined as 130-139 systolic, 80-89 diastolic; stage 2 as $\geq$ 140 systolic, $\geq$ 90 diastolic).[8] Indications at present, then, are that the condition is controlled by medication.

As for obesity, the CDC recently reduced its danger threshold from a BMI of 40 to one of 30. *See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*,

---

[8] Petitioner represented to the court that the authorities in Hudson County, where she was confined until very recently, "[did] not regularly monitor her blood pressure." (TRO Brf. 4–5, DE 2-1) It is possible to quibble about the meaning of "regularly." The medical records submitted disclose blood pressure readings taken on 9/2, 9/5, 9/16, 10/8, 11/13, and 12/17 in 2019, as well as 1/8, 2/18, 4/1, 4/9, 4/13, 4/27, 5/4 (twice), 5/12, 5/14, 5/25, 6/5, 6/14, and 6/19 in 2020. (DE 11-2) The latter seems to be the most recent information in the record.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited July 20, 2020). Petitioner's reported BMI is 30.8, within the danger range but near the bottom.

### B.   Conditions at Bergen County Jail

Having analyzed Petitioner's medical condition, I must also consider the conditions at Bergen County Jail.

Captain Russo provides a list of measures that have been implemented at the facility to combat the spread of COVID-19. However, as Dr. Greifinger points out, and as other courts within this district have found—albeit at different times, with respect to a quickly changing situation—these measures may be "insufficient to protect Petitioner from contracting COVID-19." *Renat T.*, 2020 WL 3819227, at *7.[9] Such cases have emphasized that Bergen County Jail does not have any

---

[9]      Judge Arleo found, however, that the petitioner in the *Renat T.* case had an array of serious medical conditions not present here:

> Petitioner asserts that he "presents at least two pre-existing conditions, chronic lung disease and immunodeficiency" and that his "chronic kidney disease is a comorbidity that may elevate his risk of serious illness." . . .

> Dr. Kosmuratova has also provided a supplemental Statement of Health, dated June 29, 2020, stating that she was Petitioner's treating physician from 2005 until 2017, see ECF No. 46 at 1, Supplemental Statement of Health. The Supplemental Statement provides more detail about Petitioner's history of and treatment for numerous chronic medical conditions, including: chronic cholecystitis, polyposis of the gall bladder, chronic gastritis, chronic cholestatic hepatitis, chronic neuromuscular syndrome, chronic pyelonephritis, vegeto vascular dystonia, and osteochondrosis in 2005; exacerbation of chronic prostatitis, varicocell on the left side, discirculatory encephalopathy, iron deficiency anaemia, and secondary immunodeficiency during the period from 2012-2016; and, most recently, acute bronchitis, exacerbation of chronic pyelonephritis, and exacerbation of gastritis, for which he was hospitalized in 2017. See id. Petitioner's physician also notes that Petitioner was born very prematurely at 28 weeks gestation and suffered from bronchopulmonary dysplasia and congenital intracranial hypertension since his childhood; he also suffered from a lack of sensory and motor abilities and had frequent

"specific protocols in place to protect the most medically-vulnerable people in their custody and are testing only symptomatic individuals [. . .] even though asymptomatic individuals can transmit the virus." *Asmed B.*, 2020 WL 2539351, at *8; *see Renat T.*, 2020 WL 3819227, at *7; *Anthony O.*, 2020 WL 2571897, at *7.

It does not seem that Bergen County conducts regular, universal testing of detainees. Rather, it relies on initial testing on admission, plus testing of others who show or complain of symptoms. We do not seem to have figures on how many individuals have actually been tested, so the number of reported cases is to some extent a fraction without a denominator. Moreover, individuals may be asymptomatic yet contagious; in particular, temperature screening of staff is an imperfect indicator. That said, the number of reported cases is currently quite low.

It is always true that more safeguards would be better, and that the court must assess risks, not just consider actual cases of illness. Still, I must look at results as well. From that point of view, Bergen County looks better.

At the most general level, New Jersey in July does not look like New Jersey in March, April, and May; from a peak of some 4,500 new cases per day in mid-April, we have decreased to levels in the neighborhood of 300–400, and a reinfection rate fluctuating just above and below 1.0. *See* New Jersey COVID-19 Information Hub, https://covid19.nj.gov/ (last visited July 20, 2020). That tends to reduce the risk of infection from outside. A second wave, of course, is possible, but speculative at this point.

---

acute respiratory viral infection and bronchitis (3-4 times per year), due to reduced immunity until he was a teenager. Id. Petitioner's physician opines that his chronic medical conditions and low immunity place him at risk of severe complications were he to contract COVID-19.

2020 WL 3819227 at *3–*4. Judge Arleo made similar findings regarding Bergen County Jail in *Anthony O. v. Decker*, Civ. No. 20-3856, 2020 WL 2571897, at *7 (D.N.J. May 20, 2020), and *Asmed B. v. Decker*, Civ. No. 20-3734, 2020 WL 2539351, *8 (D.N.J. May 19, 2020).

Within the institution, as of July 8, 2020, a total of just two ICE detainees had tested positive for COVID-19. One was released in March and the other emerged from quarantine on April 13, 2020, three months ago. Testing has been far from universal, but there are currently no detainees who are symptomatic or suspected of having COVID-19. (Again, there seem to be no separate figures for the women's unit.) The county inmates are housed separately; among them, just one has tested positive, and another, suspected of having the virus, is under observation. To date, 27 correctional officers and five nurses have tested positive; of these, two remain in quarantine, but the rest have been cleared and returned to duty. Here, too, there is reason to think that cases are not, at least for now, increasing.

It is possible to discern a trend in this district's cases toward denial of relief as anti-COVID measures have taken effect and reported cases have decreased. *See, e.g., Leandro R. P. v. Decker*, Civ. No. 20-3853, 2020 WL 2731102, at *2 (D.N.J. May 22, 2020) (in which I continued the release on bail of Hudson county detainee with hypertension and asthma, noting that cases in that facility had increased fivefold since my prior opinion); *Javier M. S.-H. v. Tsoukaris*, Civ. No. 20-4600, 2020 WL 2832569 (D.N.J. June 1, 2020) (in which Judge Wigenton denied release of detainee at Elizabeth Contract Detention Facility who suffered from hypertension); *Lorenzo D.C. v. Decker*, Civ. No. 20-4036, 2020 WL 3969910 (D.N.J. July 14, 2020) (in which Judge Cecchi denied relief to 77-year-old detainee with serious criminal record held at Hudson County, despite evidence of prior stroke, high blood pressure, modestly enlarged heart and a partially collapsed lower right lung, shortness of breath); *Diego A. A., et al., v. Decker*, Civ. No. 20-4337, 2020 WL 3969948, at *1 (D.N.J. July 14, 2020) (in which Judge Arleo denied the petitions of five detainees held at various facilities including Hudson and Bergen).

## C.  Balancing of Risk with Government's Interests

This Court has in prior cases ordered release based on not dissimilar levels of risk. Here, however, the legitimate countervailing interests of the government are significant and weighty, and, given the recent procedural history, it appears that removal is imminent.

As always, Respondents have a general interest in enforcing immigration laws, protecting the community, and preventing individuals from absconding. *See Jorge V. S. v. Green*, Civ. No. 20-3675, 2020 WL 1921936, at *4 (D.N.J. Apr. 21, 2020); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (stating that detention can ensure a detainee does not abscond or engage in criminal activity before a final determination as to their immigration status can be made); *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001) (identifying "ensuring the appearance of aliens at future immigration proceedings" and "protecting the community" as governmental objectives). Those interests have particular relevance in Petitioner's case.

One important component of the government's interest here is the Petitioner's history of three reentries after removal, culminating in a criminal conviction and sentence for illegal reentry:

- In 1999, Petitioner was detained by ICE and then voluntarily self-deported to Jamaica.

- Sometime thereafter, she returned without authorization.

- On October 29, 2009, an Immigration Judge ordered that she again be removed from the United States.

- Thereafter, she reentered a second time without authorization.

- On September 26, 2016, she was again removed from the United States.

- Thereafter, she reentered a third time without authorization.

- On August 10, 2017, Petitioner was arrested by Immigration and Customs Enforcement ("ICE"). This time she was charged criminally with illegal reentry in violation of 8 U.S.C. § 1326(a), (b)(1). She was convicted and sentenced to eight months' imprisonment.

- After service of her sentence, on April 6, 2018, she was placed in ICE custody. Her petition for withholding of removal was denied and the BIA denied her appeal on February 4, 2019.

- On March 5, 2019, Petitioner filed an appeal to the U.S. Court of Appeals for the Second Circuit, and her removal was stayed pending adjudication of the appeal, pursuant to a forbearance agreement. (That appeal was recently denied. *See infra.*)

Also pertinent to the government's interest is Petitioner's history of petty crimes while in the country illegally. These are for the most part theft-related, non-violent offenses that do not pose a physical danger, and have generally resulted in conditional discharges or short prison sentences. They have been accompanied, however, by use of aliases and multiple failures to appear, requiring issuance of bench warrants. Lesser measures have been utterly ineffective to deter Petitioner. Indeed, although she professes to live in fear of being returned to Jamaica, she has continued to engage with the criminal justice system while here.

Interspersed with Petitioner's comings and goings are the following criminal arrests, failures to appear, and convictions:

- December 8-9, 1999: arrest for attempted petit larceny under alias "Sophia Tanasov"; pled guilty to disorderly conduct.

- May 14, 2000: Arrest for petit larceny (again as "Sophie Tanasov"); bench warrant issued, pled guilty in August 2005.

- December 9, 2004: arrested in New York for petit larceny (using alias "Kayann M. Byfield"); bench warrant issued, pled guilty in August 2007.

- August 15, 2005: arrested in New York (under alias "Kayann M. Marshall") and charged with aggravated unlicensed operation of a motor vehicle in the third degree and driving without a license; pled guilty to aggravated unlicensed operation of motor vehicle on September 15, 2015.

- July 20, 2007: arrested in New York; pled guilty to possession of a forged instrument in the third degree on August 3, 2007.

- December 13, 2008: arrested in New York and charged with assault in the third degree; bench warrant issued; in August 2016, pled guilty to attempted assault in the third degree.

- May 12, 2009: arrested in New York; July 29, 2009, pled guilty to petit larceny.

- July 3, 2009: arrested and charged with criminal possession of stolen property; bench warrant issued; on September 24, 2016, pled guilty to criminal possession of stolen property in the fifth degree.

- June 4, 2016: arrested in New York and charged with petit larceny; pled guilty July 20, 2016.

- August 10, 2017: arrested and charged federally with illegal re-entry, in violation of 8 U.S.C. § 1326. Convicted of illegal reentry and sentenced to eight months in prison.

Petitioner has evaded the immigration authorities reentered the country multiple times after being deported, and persisted in criminal behavior, much of it involving failures to appear and the use of aliases. At this point, the authorities may be forgiven for thinking they have exhausted

reasonable options. *See Romeo S.K.*, 2020 WL 2537647, at *7 (despite petitioner's legitimate complaints of diabetes and hypertension, balance tipped in favor of the government, because there was a final order of removal, and no adequate conditions of release given petitioner's criminal history, coupled with his history of dishonesty with immigration officials and ICE officers).

### D.  Recent Procedural History and Imminence of Removal

The final key factor in the balancing analysis is the current state of Petitioner's immigration proceedings. Where removal is not imminent, even small levels of risk can accumulate into larger ones over time, as detention continues and ICE proceedings grind on. Where an order of removal is final, however, the government's interest in detention pending removal is greater. Here, the order of removal is not merely final in the usual sense; it follows three prior removals and a criminal conviction for illegal reentry.

When this petition was filed, the BIA had denied Petitioner's appeal in which she had sought withholding of removal. Petitioner appealed that determination to the United States Court of Appeals for the Second Circuit. Pursuant to a standing forbearance agreement, ICE stayed removal for the duration of that Second Circuit appeal. Consequently, Petitioner was not removed, and her detention continued, pending the outcome of proceedings in the Court of Appeals.

On July 9, 2020, however, the Second Circuit denied Petitioner's petition for review of the BIA's decision. Petitioner's removal is no longer stayed, and she may be removed at any time.[10]

Further proceedings are always theoretically available. The practical finality of a removal order, however, is an important factor in the government's favor. *See Javier M. S.-H.*, 2020 WL 2832569 (in which Judge Wigenton denied release of detainee at Elizabeth Contract Detention

---

[10]    Counsel for the government stated that removals are occurring. Counsel for the Petitioner has stated his understanding that flights of removed aliens to Jamaica are occurring approximately once per month. (DE 21.)

Facility who suffered from hypertension, noting that government's interest was particularly strong as to person whose removal was imminent under a final order); *Gloire I. E.-B. v. Tsoukaris*, Civ. No. 20-4661, 2020 WL 2847753, at \*3 (D.N.J. June 2, 2020) (similar to *Javieri*); *cf. Tracey M.S. v. Decker*, Civ. No. 20-5146, 2020 WL 2316559, at \*7 (D.N.J. May 11, 2020) (noting large number of COVID cases at HCCC and relatively early stage of ICE proceedings, which were subject to delays, but putting off habeas decision pending result of bail hearing).

Petitioner's counsel states that he will soon file a motion to reopen immigration proceedings. The grounds for withholding removal—that petitioner was the victim of a violent crime against her person in Jamaica—have been raised before.[11] The new motion, however, will assert that Petitioner received ineffective assistance of counsel in prior proceedings. (DE 21.) The effect, if any, of that motion, and whether it will result in a stay of removal, is speculative at this point.

Two alternatives suggest themselves. One, Petitioner will be removed from the country. The Court, of course, lacks jurisdiction to enjoin the execution of a removal order. Moreover, release from custody in the face of imminent removal might well be a futile act, in that ICE would then presumably seek to execute the order. Two, Petitioner will bring her motion to reopen and obtain a stay of removal. If so, her detention will continue. That might or not prove to be a change in circumstances that would justify revival of her application. Meanwhile, I go no farther than to deny a preliminary injunction, based on the circumstances as they exist now.[12]

---

[11]     The threat comes not from government persecution but from the small group of people, well known to the Petitioner, who committed the assault in Jamaica. Presumably it is possible to avoid these persons, perhaps by moving to some other place, whether within Jamaica or elsewhere. In the sentencing memo submitted in connection with the criminal illegal reentry conviction, Petitioner's counsel stated that she intended, if possible, to live with her brother in the Netherlands. (DE 22.)

[12]     I briefly discuss the Petitioner's alternative contention that the Respondents' decision to continue her detention constitutes deliberate indifference towards her serious medical needs. (DE 1 at 26; DE 14 at 15–16.)  The applicable legal standard for an immigration detainee's inadequate medical care claim is that

## VI.    CONCLUSION

In short, Petitioner has one condition, hypertension, which "might" be a risk factor but apparently is reasonably well controlled by medication. She has another, obesity, which is a risk factor but her BMI, 30.8, is just over the threshold identified by CDC. She is in a unit with just five women. While testing has not been regular and universal, it has occurred, particularly at the intake stage. There have been a small number of cases at Bergen County, mostly in the earlier, more virulent environment of March and April, and overwhelmingly among those who guard or care for the detainees, not the detainees themselves. The risk, then, is real, but to some degree speculative, based on the assessment of shortcomings in the institution's protocols, which can be criticized but which have not resulted in actual outbreaks.

For the foregoing reasons, a preliminary injunction will be denied. An appropriate Order accompanies this Opinion.

Dated: July 20, 2020

/s/ Kevin McNulty

_____

KEVIN MCNULTY
United States District Judge

---

of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). To succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. The Supreme Court has held that an official demonstrates deliberate indifference where "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Even the medical records cited by Petitioner reveal that medical care has been regular and adequate. Moreover, Bergen County Jail has undertaken numerous measures prevent the spread of COVID-19 at their facility. *See supra.* (DE 19-1.) To say, as Petitioner does, that there are gaps in those protocols is a far cry from demonstrating deliberate indifference to her medical needs. Accordingly, I find that Petitioner has not demonstrated a likelihood of success on the merits of her deliberate indifference claim.